LUDWIG WILCKE v. ISABELLA WILCKE, Appellant, and Heirs at Law of FREDRICH WILCKE, *et al.,* Appellees.

Descent and Distribution: ALIENAGE: *Mediate and immediate inheritance.* Under Code, section 2457, providing that if both parents of an intestate be dead, the portion of the estate which would have fallen to them shall be disposed of as if they had out lived intestate, and died in possession of their portion, where a son dies after the death of his parents, who would have otherwise inherited, the inheritance which passes to his brother is direct, and does not depend on the fact whether the parents, at the time of their decease, being aliens, were capacitated to take under the provisions of the law.

TREATY RIGHTS: *Evidence.* Under the treaty ·between the king of Prussia and the prince of Waldeck, and other evidence adduced the citizens of Waldeck became subjects of the king of Prussia, so as to be affected by the terms of a treaty between the United States and Prussia governing the rights of inheritance of citizens of the respective countries.

CHILDLESS WIDOW'S SHARE. A widow if entitled to one-half the estate of her husband takes the added one-sixth in addition to the third given by Code, section 2440, as heir and not as part of her distributive share, and takes subject to the same rules as property taken by other heirs, including payment of incumbrances.

**Partition:** JOINDER AND COUNTER-CLAIM: *Practice.* Where, in partition of land, defendant claims a lien on the property because of the payment of a mortgage thereon, plaintiff can ask to have a claim for rent growing out of the occupancy of the land by such defendant adjusted, though Code, section 3277, provides that there shall be no joinder or counter-claim of any other kind, in partition.

*Appeal from Clinton District Court.*—HON. P. B. WOLFE, Judge.

FRIDAY, MAY 14, 1897.

ADAM WILCKE died intestate in 1891 in Clinton county, Iowa, seized of eighty acres of land, which he acquired in 1877, while a non-resident alien. He became a citizen of the United States in 1882. He left surviving him, as his widow, the defendant Isabella Wilcke, but no issue. The parents of Adam Wilcke died in Germany prior to his death, and it seems to be conceded that they were incapacitated to inherit real estate by the law of this state. Adam Wilcke also left surviving him the plaintiff, Ludwig Wilcke, a brother of the full blood, Christian Wilcke, a brother of the half blood, and the heirs of certain other brothers of the half blood, whom it is unnecessary to name. The plaintiff and all the other survivors, except the widow, were, at the death of Adam Wilcke, aliens, and residents of Waldeck, Germany. Christian Wilcke and the heirs of the other brothers of the half blood are made parties defendant to this

suit.  The action is for the partition of the eighty
acres of land left by Adam Wilcke.  The plaintiff
represents in his petition that the widow is entitled
to an undivided one-half of the land; that he, as
brother of the full blood, is entitled to an undivided
five-sixteenths; that Christian Wilcke, a surviving
brother of the half blood, is entitled to an undivided one-
sixteenth; and the heirs of deceased brothers of the half
blood to proportionate shares.  By an amendment
to the petition, the plaintiff pleaded a treaty between
the United States and the king of Prussia, because
of which it is claimed that the non-resident alienage
of the parties does not defeat their right of inheri-
tance.  The petition asks a confirmation of the shares
in accordance with the averments, and for partition
accordingly.  The widow alone answers.  She pleads
the facts as to the non-resident alienage and the
decease of the parents of Adam Wilcke, and that the
other defendants and the plaintiff "would become
entitled to inherit, if at all, only by tracing their
rights of inheritance through the said father and
mother of said Adam Wilcke."  She further pleaded
facts to show that the land in question was incum-
bered by mortgage at the death of Adam Wilcke,
which, under the belief that she owned all of the land,
she had paid off, and asked, if any part should be
found to belong to the other claimants, that the
amount she had so paid should be paid therefrom.  In
reply, the plaintiff pleaded that, since the death of
Adam Wilcke, the widow has occupied and received
the rents of the premises entire, and asked that the
value thereof be deducted from the amount due
because of the discharge of the mortgage lien on the
land.  The district court found as facts that the plain-
tiff and the defendants, except Isabella Wilcke, were
subjects of Prussia, and of the king of Prussia, at the
time of the death of Adam Wilcke, and the plaintiff

has, since the death of Adam Wilcke, removed to, and is now residing in Iowa, and that partition of the land could not be equitably made. It confirmed the shares as alleged and asked by plaintiff; allowed the widow's claim for disbursements to discharge the mortgage lien from the land, after deducting the amount of the rents of the land therefrom; and ordered a sale of the land, and a distribution of the proceeds in accordance with the judgment as to shares. The defendant Isabella Wilcke appealed.—*Affirmed.*

*Eldred S. James* for appellant.

*S. C. Scott* for appellee.

GRANGER, J.—I. As has been stated, plaintiff, in his reply, recited the facts as to the occupancy of the land by appellant, and asked that the rents received therefrom be deducted from the claim for disbursements on account of the mortgage lien discharged by her. Appellant moved the court to strike that part of the reply. The motion was denied, and complaint is made of the ruling. The claim is that it is an independent action in the nature of an accounting, or for money claimed. It is said, if it was to come into the action, it should have been pleaded in the petition. That could not have been done, because of Code, section 3277, which provides that there shall be no joinder or counter-claim of any other kind in an action for partition. Appellant concedes that she pleaded a counter-claim, in asking to recover for the disbursements to discharge the mortgage; and, but for that, we should hold that the claim for rent was improperly pleaded in a reply. It may be doubted if the counter-claim by appellant is within the exceptions of the chapter regulating the procedure for partition of real estate. But that we do not decide.

for no such question is raised. It was, however, an independent right of recovery, but pleaded in this proceeding to secure a lien for its payment. It grew out of her occupancy and treatment of the land as her own. The claim for rent grew out of the same occupancy and treatment of the land by her, and the attempt seems to have been to adjust the debit and credit claims of the occupancy so as to leave the shares of the land, if partitioned, or the proceeds of it, if sold, freed from liens. Ordinarily, such a plea would not be one in avoidance of the counter-claim pleaded by appellant, but as her claim is sought to be made a lien on the subject-matter of the suit, and the plea in the reply is to avoid such a lien, in whole or in part, we think the court did not, in view of the situation, err in denying the motion.

II. Appellant states her second proposition for consideration as follows: "The appellees must trace their right of inheritance through the father and mother of the deceased, and, both having died aliens, the right of inheritance is cut off." As we gather appellant's thought, it is that the inheritance of brother from brother is not immediate or direct, but mediate or indirect, as through another. Applied to this case, the thought is that plaintiff's right to inherit from his brother Adam depends on whether one or both of their parents could have so inherited at the time of death. If yes, that right is transmitted to the plaintiff. If no, it is lost. The conclusion must be reached in the light of the following provisions of the Code:

Section 2455. "If the intestate leave no issue, the one-half of his estate shall go to his parents and the other half to his wife; if he leaves no wife, the portion which would have gone to her shall go to his parents."

Section 2456. "If one of his parents be dead, the portion which would have gone to such deceased parent

shall go to the surviving parent, including the portion which would have belonged to the intestate's wife, had she been living."

Section 2457. "If both parents be dead, the portion which would have fallen to their share by the above rules, shall be disposed of in the same manner as if they had outlived the intestate and died in the possession and ownership of the portion thus falling to their share, and so on through ascending ancestors and their issue."

It is not easy to deduce appellant's thought from the language of section 2457. The sections quoted plainly provide that, if the parents are alive, the property goes directly to them, because of their preference as heirs. If dead, it does not go to their estate for inheritance from them, but the heirs of the parents are made the heirs of the intestate, and the manner of disposition is made the same as if the parents had inherited, and the heirs had taken from them. The fact of the death of the parents being proved, the principal, if not the only object of section 2457 is, to identify the heirs of the intestate, and determine their proportions. In *Lash v. Lash*, 57 Iowa, 88 (10 N. W. Rep. 302), speaking to a state of facts to make the language entirely applicable to the question we are considering, this court, through Adams, C. J., said: "The estate in question never constituted any part of Christian Lash's estate, and was therefore never affected by Christian Lash's will. As the estate in question never constituted any part of Christian Lash's estate, no part thereof ever passed from Christian Lash to Anna Lash by inheritance, distribution, or otherwise. Whatever the plaintiff or any other heir of the intestate takes, he takes directly from the intestate, and not otherwise. Nothing, in fact, intervenes between the death of the intestate and the transmission of his estate to his heirs.

The survivorship of the parents is a fiction. We suppose it to determine the descent. For that purpose we need suppose it as continuing only for an instant. Both parents are to be supposed as then dying in the ownership of the property which would have gone to them respectively. Neither is to be supposed as taking from the other, because in fact neither has anything which the other can take. It is immaterial which of the parents died first, or whether the one which died first died testate or intestate." There is much significance in these words: "Nothing in fact intervenes between the death of the intestate and the transmission of his estate to his heirs. The survivorship of the parents is a fiction. We suppose it to determine the descent." We do not think it important to elaborate the thought. We think that where property passes from brother to brother, under the law we are considering, the inheritance is direct, and does not depend on the fact of parents, at the time of their decease, being capacitated to take under the provisions of our law. There is nothing in *McGuire v. Brown*, 41 Iowa, 656; *Neeley v. Wise*, 44 Iowa, 544; or *Moore v. Weaver*, 53 Iowa, 11 (3 N. W. Rep. 741), not in accord with this conclusion. The rule as to the descent of property under similar conditions has been much considered by the courts, and the judges of particular courts in this country and in England have been somewhat divided as to the precise facts under which a descent of property shall be said to be mediate or immediate. In this state, in *Furenes v. Mickelson*, 86 Iowa, 508 (53 N. W. Rep. 416), an inheritance from a great uncle, through a father, is said to be mediate. So far as we have seen, such a rule is universal. Just what degree of consanguinity will mark the distinction between mediate and immediate inheritance does not seem to be definitely defined. It has been said that "in tracing the line of

inheritance between brothers, or their descendants, it is not necessary to name the father as the common ancestor, and that alienism in any ancestor whom it is not necessary to name in tracing such inheritance or descent does not have the effect to impede it." In *Beavan v. Went* (Ill. Sup.) 41 N. E. Rep. 91, the question of inheritance, and how it is affected by non-resident alienage, has received quite extended discussion, and we quote from that case as follows: "Descents have long been distinguished as mediate and immediate; but as shown by Mr. Justice Story in *Levy's Lesee v. McCartee*, 6 Pet. 102, these terms are susceptible of different interpretations, whence some confusion has been introduced into their legal discussion, since different judges have used them in different senses. But as said by Lord Hale, as quoted in *Collingwood v. Pace*, 1 Vent. 413: 'In immediate descent there can be no impediment but what ariseth in the parties themselves; but in mediate descents, it is agreed, the disability of being an alien or attainted, in him that is the medius antecessor, will disable the other, though he have no disability.' In *Collingwood v. Pace*, which was argued before all the judges of England, the question was whether the inheritance by a brother from his brother, the father being an alien, was mediate or immediate; and it was decided, after much discussion, by seven judges againt three, that the inheritance was immediate, so as not to be affected by the alienage of the father. It was held that in tracing the line of inheritance between brothers, or their descendants, it was not necessary to name the father as their common ancestor, and that alienism in an ancestor whom it was not necessary to name in tracing such inheritance or descent does not have the effect to impede it. In *McGregor v. Comstock*, 3 N. Y. 408, the same rule was applied to an inheritance between first cousins, their fathers being citizens, but

whose grandfather was an alien. Thus, in *Jackson v. Green*, 7 Wend. 333, the intestate was a naturalized citizen, and the claimants were the heirs at law of a cousin of the intestate, who was also a naturalized citizen. It was claimed that the descent between cousins was immediate, notwithstanding the circuity of the line of sanguinity, and that the alienage of their intervening relatives was no bar to the inheritance; but this claim was disallowed, it being held that, while the descent from brother to brother was considered immediate, that from cousin to cousin was not." In that case, the relationship between the claimant and the testator was quite remote, and the rule of mediate descent was applied, and the right of inheritance denied, by a divided court. In this case the rule need have no broader application than as between brother and brother, for the appellees are not in dispute, and such a rule concludes the appellant.

III. A more difficult question is whether the treaty pleaded as existing between the United States and Prussia takes the claimants, against the widow, out of the provisions of our law prohibiting non-resident aliens from acquiring property in this state by descent. No question is made as to the prohibition in this case, unless such claimants are relieved from the operation of the law by the terms of the treaty pleaded. Nor is there any question but that, if the plaintiff and the other appellees were subjects of the king of Prussia at the decease of Adam Wilcke, the treaty operates to relieve them from the prohibitions of the law. We are to determine, as a question of fact, whether the province of Waldeck is so far a part of the kingdom of Prussia that citizens of Waldeck are subjects of the king of Prussia, within the meaning of the treaty between the United States and Prussia. As the record is presented, we are to determine this question in the light of history, as it may be

aided by particular evidence introduced. The basis
for the claim that its citizens are such subjects is a
treaty between Prussia and Waldeck relative to the
transfer of the administration of Waldeck to Prussia.
The articles of treaty appear in the record, and they
appear as made by "his majesty, the king of Prussia,
and his serene highness, the prince of Waldeck"; and
it is expressed that the parties are "animated by the
wish of facilitating the entry of the principalities
of Waldeck and Pyrmont into the North German
Confederation." The articles are some twelve in
number, from which it appears that Prussia
undertakes the internal administration of the
principality of Waldeck, exclusively, except in certain
particulars, which seem to be mainly of ecclesiastical
and charitable importance. While the administration
is to be in the name of the prince, a governor is
appointed by the king, and placed at the head of the
administration of the principality, and undertakes
"the constitutional responsibility of the government of
the country." Prussia is empowered to organize the
judicial and administrative authorities differently,
according to her judgment. Prussia is to receive the
whole of the services of the principality, and defray
all expenses, except some pertaining to ecclesiastical
authority. All the state servants are appointed by
Prussia, are Prussian subjects, and take the oath of
allegiance to the king. The representation of the
country abroad is retained by the prince, but it is
exercised under the responsibility of the governor,
who is appointed by the king. It is to be said that
the authority reserved to the prince is of slight impor-
tance, and practically divorced from the temporal
concerns of government. The articles speak of Wal-
deck both as a principality and a state. The testi-
mony as to the application of the treaty to gov-
ernmental affairs shows, as to its temporal concerns

generally, that the province is as much a part of the Prussian kingdom as any province could be with any slight reservation of governmental authority. It has a slight representation in the federal council and imperial diet, or at least it did have. It is historically said, that its military affairs are all in the hands of the Prussian government, and education, the administration of justice, and similar matters, are all conducted on the Prussian model. If a subject is one who is governed by the laws of a sovereign or country, and owes allegiance thereto, it is difficult to escape the conclusion that the citizens of Waldeck are subjects of the king of Prussia. Prussian authority is almost, if not quite, absolute, as to its military, judicial, and administrative affairs. Little, if anything, of importance is left, except its religious concerns. These, we think, are the controlling facts in the case; and our conclusion is, that because of the treaty between this and the Prussian government, the appellees inherit from Adam Wilcke.

IV. The district court, in fixing the shares, first gave to appellant one-third of the land. It then ordered that, from the remaining two-thirds, the disbursements by appellant should be paid, and of the balance it gave to appellant one-fourth thereof, and the remainder to the appellees, as before stated. The effect of the order was to make the one-sixth necessary to make the difference between the one-third and one-half going to appellant bear its proportion of the incumbrance, leaving to appellant one-third in no way affected by the incumbrance. She now urges that no part of her half should have been subjected to that burden. It is said the court was governed by the rule of *Smith v. Zuckmeyer*, 53 Iowa, 14 (3 N. W. Rep. 782), and other cases. In the *Smith-Zuckmeyer Case* it is held that the distributive share of the widow, which is given her by Code, section

2440, and which includes the dwelling house given by law to the homestead by section 2441, consists of the one-third in value of the real estate, and that, if she is entitled to one-half, the added one-sixth, to make the one-half, she takes as heir, and not as a part of the distributive share to the widow. The case places the one-sixth taken as heir outside the operation of the law by which the distributive share is protected in certain particulars, and it is subject to the same rules as property taken by other heirs. We think appellant has no ground of complaint because of the action of the court. The judgment of the district court will stand AFFIRMED.